ROSALIE MAXIMILIAN, ADMINISTRATRIX, ETC., RESPONDENT, *v.* THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, APPELLANT.

*Chap. 510, Laws of 1860, and chap. 137, Laws of 1870 — Municipal corporation — when responsible for acts of its officers.*

Under the acts creating a department of charities and corrections in the city of New York, the entire management and government of the department were confided to the commissioners, and that included the appointment, control and direction of all subordinates employed in it; and such employes are solely and exclusively the servants and subordinates of the commissioners, as public officers whose powers and duties are prescribed by the laws of the State.

In this action, brought to recover damages for the death of the plaintiff's intestate, occasioned by a collision with an ambulance, driven by an employe of the commissioners of public charities and corrections, *held*, that the defendant was not responsible for the negligent acts of such driver, and that the plaintiff was not entitled to recover.

A municipal corporation is not liable for omissions of duty specifically imposed by statute upon one of its officers.

APPEAL from a judgment entered in favor of the plaintiff, and from an order denying a motion for a new trial, made upon the minutes of the justice before whom the trial was had.

On the 26th of May, 1871, at about half-past ten o'clock in the evening, the plaintiff's intestate was injured so severely by collision with an ambulance, driven by an employe of the commissioners of public charities and corrections, that he died within ten days

thereafter. This action was brought to recover damages, on the ground that the accident occurred through the negligence of the driver of the ambulance.

*E. Delafield Smith*, counsel to the corporation, cited 2 Dillon on Corporations, section 772; *Martin* v. *Mayor* (1 Hill, 545); *Lorillard* v. *Town of Monroe* (11 N. Y., 392); *Bank of Commonwealth* v. *Mayor* (43 id., 184); *Atwater* v. *Baltimore* (31 Md., 462); *Hafford* v. *City of New Bedford* (16 Gray, 297); *Fisher* v. *Boston* (104 Mass., 87); *O'Meara* v. *The Mayor* (1 Daly, 425); *Richmond* v. *Ting* (17 Grattan, 375).

*Benj. H. Bayliss*, for the respondent. No action would lie against the department of charities and corrections. (*Gardner* v. *Board of Health*, 10 N. Y., 409; *People* v. *Supervisors of Monroe*, 18 Barb., 567.) The defendant was liable. (*Thayer* v. *City of Boston*, 19 Pick., 516; Ang. & Ames on Corp., 304; *Lee* v. *Village of Sandy Hill*, 40 N. Y., 442; *Mayor of N. Y.* v. *Furze*, 3 Hill, 612; *Rochester White-Lead Co.* v. *City of Rochester*, 3 Coms., 463.)

DANIELS, J.:

This action was brought to recover the pecuniary loss sustained by the next of kin of the intestate, in consequence of his death being caused by the negligent act of an ambulance driver, at the time claimed to have been the servant, and in the employment, of the defendant. The death of the intestate was not claimed to be attributable to any act or agency of the defendant, beyond that performed by the driver. For that reason, if he was not, at the time, in the defendant's service, no liability for his negligent act was established against the defendant.[*] At the time when the accident happened, which was in May, 1871, the ambulance colliding with the intestate, by which the injuries were produced which caused his death, was under the direction of the commissioners of charities and corrections of the city of New York, and the driver in charge of it, seems to have been in their employment. The

---

[*] Blake v. Ferris, 1 Seld., 48; Pack v. Mayor, etc., 4 id., 222; Kelly v. Same, 1 Kern., 432.

evidence upon these subjects is quite slight as it has been presented by the case, but nothing more was shown, from which it could be inferred that either the ambulance or its driver was in the employment of the defendant.    If he sustained, at the time, the relation of servant to the defendant, in any sense whatever, it was wholly due to the circumstance that he was employed by, and in the service of, the commissioners.    It becomes necessary, therefore, as the objection was explicitly taken at the trial, to ascertain and determine whether such employment and service, in any legal sense, rendered the driver, at the time, the servant of the defendant.    For, if it did not, no liability was established by the evidence, and the judgment, consequently, would be erroneous.

The department of charities and corrections was created in 1860, by chapter 510, of the Session Laws of that year.    It was not then made a department of the government or corporation of the city, but was declared to be created in the city and county of New York. And it was then constituted by four commissioners, to be appointed for five years by the comptroller of the city.    The commissioners, when appointed, were constituted a board of control over the department created, and the books, accounts, vouchers, records and all the property of the alms-house department, were directed to be transferred to their keeping and custody, for the use thereafter of their department, while the property itself continued to be owned by the defendant.    The new department was then empowered and directed to possess and exercise *full and exclusive* powers for the government, management, maintenance and direction of the several institutions, buildings, premises, property and appurtenances which, preceding their appointment, were under the control of the board of governors of the alms-house, including the alms-house, work-house, nurseries for poor and destitute children, the county lunatic asylum, the potter's field, the penitentiary, city prison and houses of detention, except the house of refuge, juvenile delinquent asylum, house of detention for witnesses, and sheriff's jail.    And the property and places, so assigned to them, were designated as the institutions of the public correction and charities.*    The department was then empowered by its commissioners to appoint and remove, or, by rules provide

* Laws of 1860, chap. 510, § 4.

for the appointment or removal of, such subordinate officers as it should see fit, for the purpose of distributing its powers of *government, management* and direction; define their respective duties and authority, and fix their respective designation of office, and prescribe their compensation. And the commissioners were further given all the powers of the preceding alms-house commissioners and governors.* They were also given authority to make rules and by-laws for the management and government of the department, and of each institution as should seem to them necessary, not inconsistent with the act, or the laws of the State.† And they were empowered to alter and repair their buildings, and erect others when, in their judgment, necessary or expedient.‡ And the board of supervisors were to annually raise and collect, by tax on the real and personal property of the city and county, such sum of money as the commissioners should, from time to time, require for their department in the execution of their powers, which was to be applied by them to the purposes of the act.§ They were also given the control of the poor, and of the other persons confined in the institutions under their government and management. By the amendments made to the charter of the city of New York in 1870, the department of public charities and corrections was made one of the departments of the city. The commissioners were increased to five in number, and the power of their appointment was vested in the mayor, instead of the comptroller who previously possessed it; and after that, they were required to report to the mayor. ‖ But their powers and duties were in no essential respect changed. For that act provided that the board should still possess all the powers, and discharge all the duties, conferred upon the department by the act of 1860, and acts and parts of acts amendatory thereto, except as modified or repealed by the law then enacted. ¶ And that made no other substantial change than those already mentioned in either of them.

These laws created a department of charities and correction, with powers and duties of an independent nature, in no wise within the control of the defendant, unless other provisions and regulations might become necessary for its more complete organization and the ·

---

* Id., § 5.     † Id., § 16.     ‡ Id., § 17.     § Id., § 20.
‖ Vol. 1, Laws of 1870, 373, §§ 30, 32; 386, § 80.     ¶ Id. 386, § 80.

perfection of its powers and duties. If they did, then the common council of the city was required to provide them by ordinance. But even that body was denied the power of passing any ordinance regulating the internal affairs of the department, except upon the previous written application of the head of the department. * Under these laws, the entire management and government of the department were confided to the commissioners, and that included the appointment, control and direction of all subordinates employed in it. They were solely and exclusively the servants and subordinates of the commissioners, as public officers whose powers and duties were prescribed by the laws of the State. Among them was necessarily included the driver, by whose careless act the intestate lost his life.

These commissioners were not in the service of the defendant, but of the public, having their own functions and authority prescribed and defined by the laws of the State. Neither the mayor nor the common council, nor both combined, nor any other officer of the city, could control, restrain, or direct them. They were not responsible to any power but the laws, for the manner in which their authority should be exercised; and their servants and subordinates were subject alone to them and their rules, regulations and commands. They were, in no proper or legal sense, the servants or subordinates of the defendants. They had no power to employ, control, direct or manage them; and of necessity they could not· therefore be liable for their acts or omissions.

In the case of *Martin* v. *Mayor, etc., of Brooklyn,*† COWEN, Justice, says, that "no case has been cited wherein it has been holden, that municipal corporations are liable for omissions of a duty specifically imposed by statute on one of their officers. In this respect the latter are *quasi* civil· officers of the government though appointed by the corporation. The relation of master and servant does not exist between the corporation and officers." ‡ In the case of *The Mayor of New York* v. *Bailey,* § the correctness of this principle was conceded, but the city was held liable because it instructed the commissioners to proceed with the work, and for the further reason that it was constructed on the defendant's

* Laws of 1870, vol. 1, 397, § 102.        † 1 Hill, 545.        ‡ Id., 551.
§ 2 Denio, 433.

land. * Senator HAND, in the course of his opinion, held, that municipal corporations though not liable for the acts of independent officers whose duties are specifically prescribed by law, though appointed by them, have been held liable for the acts of their officers and agents of whom they had the appointment and *supervision*, and when the duty to be performed was for the benefit of the corporation. " On the other hand, where such a corporation is bound to appoint an officer for the performance of a public duty, it is not liable. Neither is an individual, who, in the performance of a public duty, is obliged to appoint third persons to perform labor for the public, liable for their acts, unless in cases of personal supervision, so long as they keep within the scope of their authority." † The president of the senate, in his opinion, held, that : "At the common law, where an agency exists, the principal becomes responsible for the acts of his agent, because he has the right to employ, and the authority to control him. Where the right of employment and the authority to control are both wanting, no agency can exist ; for the acts of the agent cannot in such a case, upon the principles of common law or common sense, become the acts of the principal." ‡ The decisions made in *Lorillard* v. *Town of Monroe* § and *Cosgrove* v. *Ogden*, ‖ confirm this view. And there is nothing inconsistent with it, in *Gardner* v. *Board of Health*.¶ For all that was there held, was, that the board could not be sued as a corporation. And it does not follow from that, by any means, that its members could not be sued as individuals, and rendered liable in such suit, for the consequences of the misconduct of those subordinately employed by them. The case certainly contains nothing sanctioning the liability of the defendant in the present action.

In Massachusetts, the rule of the common law, as it has been understood in their State, has been adopted.** And it follows from it, that the defendants were not liable for the act of the ambulance driver, by which the intestate received the injury from which he afterward died. For that reason, it cannot be necessary to consider

---

* Id., 444, 445.                  † Id., 447, 448.                  ‡ Id., 453.
§ 1 Kernan, 392.              ‖ 49 N. Y., 255.              ¶ 10 N. Y., 409.
** Hafford v. New Bedford, 16 Gray, 297 ; Walcott v. Inhabitants of Swampscott, 1 Allen, 101 ; Fisher v. Boston, 104 Mass., 87.

the other objection made to the plaintiff's right to recover.    The judgment and order denying a new trial should be reversed, and a new trial ordered, with costs to abide the event.

Davis, P. J., and Brady, J., concurred.

Judgment and order denying a new trial reversed, and new trial ordered, with costs to abide the event.